## Michael T. Cahill v. Louis Madison.

1. INJUNCTIONS—*Restraining the Violation of a Restrictive Covenant in Relation to Personal Services.*—As a general rule, equity will not interfere by injunction, to restrain the violation of a restrictive covenant in relation to personal services, but this rule is not applicable to the case of a party betraying a trust and confidence reposed in him by an employer, by attempting to take away, for his own benefit and in direct violation of his express contract, his employer's customers, knowledge of whom he acquired in the course of the performance of his duty as an employe.

**Bill for an Injunction.**—Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding.   Heard in this court at the October term, 1900.   Reversed and remanded.   Opinion filed March 14, 1901.

**Statement by the Court.**—On the 14th day of December, 1897, said Cahill of the first part, and Madison of the second part, both of Chicago, Illinois, entered into a contract of that date under seal, which, omitting the formal commencement and conclusion, is as follows :

" Witnesseth, that for the good and valuable considerations hereinafter stated, said first party has employed and does hereby employ said party of the second part to assist in carrying on his business, in the city of Chicago, in the capacity of salesman and collector or any other reasonable or usual capacity therein as said party of the first part may direct, at the weekly compensation of $10 per week and commission from the date hereof; it being expressly agreed that said employment may at any time hereafter be terminated by said party of the first part for good and sufficient cause, or by either party upon giving thirty (30) days' notice to the other party.

And said second party promises and agrees that he will, at all times, during the life of this contract, faithfully and industriously perform the duties of said position of salesman and collector, and that he will give to said first party thirty (30) days' notice of his resignation as salesman and collector.

And the said party of the second part, for and in consideration of the foregoing, hereby expressly agrees, which agreement is of the essence of this contract, that if he shall be at any time hereafter discharged by, or voluntarily quit the employment of said first party, he will not within one year thereafter solicit orders from, or make deliveries of teas, coffees and spices, or other goods, wares and merchandise carried by the party of the first part, either for himself or for any firm of which he may be a member, or by it employed, or for any other individual or corporation, either directly or indirectly, to any of the customers of the said party of the first part with whom he may be brought in contact while soliciting and delivering orders for teas, coffees and spices, and while working on the sales routes of said first party, or in any other capacity within the scope of his said employment."

February 19, 1900, Madison left the employment of Cahill

after having worked for him for over two years as a delivery-man and salesman, having charge of a sales route belonging to Cahill, and engaged in the business of selling teas and coffees for himself under the trade name of The Enterprise Tea Co., at No. 300 North Lincoln street, Chicago. On March 17, 1900, Cahill filed his bill in the Circuit Court of Cook County against Madison, seeking an injunction to prevent said Madison from soliciting and attempting to take orders for and delivering teas, coffees, spices, baking powder, extracts, and other goods carried by said Cahill, to the customers of the latter, in contravention of said contract, and from interfering in any manner with the customers of Cahill or in attempting to divert their trade from him for the period of one year, or until the further order of the court. An injunction was issued the same day, according to the prayer of the bill, and thereafter a motion to dissolve the same was overruled. A change of venue was taken from the judge before whom said motion to dissolve was made and overruled, and thereafter the cause coming on to be heard upon demurrer to the bill before another judge of said court, the court entered a decree dismissing the bill for want of equity, to reverse which Cahill took this appeal.

The bill in substance alleges that Cahill is engaged in the retail tea and coffee business at No. 1005 West Lake street, Chicago, and has been engaged in such business in Chicago for over thirteen years; that he sells goods from his store in the regular course of trade, and his business largely consists of trade supplied along regular sales routes; that he employs canvassers to obtain orders for teas and coffee in the residence districts of Chicago and suburbs, to be filled at future days, when he sends out delivery wagons, each with a salesman, who delivers the goods and takes orders for more; that he has established and maintained these sales routes for a long period of years against strong competition and at great expense to himself, so that the good will and permanency of said routes are of great value to him; that when Madison left his employ the number of customers

constituting the sales route belonging to him and canvassed by Madison numbered about 600 persons, the bill stating the names and addresses of several of such customers; that after Madison left complainant's employ he solicited trade from said customers, naming them, with a view of obtaining orders in his, Madison's, behalf; that Madison threatened and attempted and still continues to threaten to solicit orders from and to deliver goods to other customers of Cahill to take the place of goods ordered from Cahill; that on March 14, 1900, Madison did, in direct violation of said contract, solicit trade for teas, coffee and spices of said customers above named, and on that day and March 15th, did deliver coffee to each of them; that if he continues said course of conduct, the business of complainant will suffer irreparable injury; that Madison is without property, is financially irresponsible, and unable to respond in damages to Cahill.

When the appeal had been perfected in this court, upon motion of appellant, the injunction was continued in force pursuant to the statute.

Frederic P. Vose, attorney for appellant.

J. E. Ricketts, attorney for appellee.

Mr. Justice Windes delivered the opinion of the court.

In support of the decree dismissing the bill for want of equity, appellee claims that the contract set out in the statement is unilateral, without mutuality, without consideration and unconscionable. The authorities cited in support of these claims are not, in our opinion, applicable to the contract here under consideration, and therefore we deem it unnecessary to review them. The contract is not unilateral for the reason that Cahill by its terms undertakes to and does employ Madison to work for the former as a salesman and collector at least for the period of thirty days, unless for good and sufficient cause the contract should be sooner determined, and at a compensation of $10 per week and commission. Madison, by the terms of the contract,

accepts the employment and agrees to perform the duties of the position at least for the time named. Each party to the contract by its terms had the right to terminate it upon giving the other thirty days' notice. For the same reasons that the contract is not unilateral, it is mutual.

Nor is the contract without consideration. It is elementary that a promise for a promise is sufficient consideration to support a contract. This contract, however, recites that the second party "for and in consideration of the foregoing" (referring to the mutual promises and undertakings of the respective parties) expressly agreed, and the agreement is made the essence of the contract, that if he should at any time thereafter be discharged by or voluntarily quit the employment of Cahill, he, Madison, would not "within one year thereafter solicit orders from or make deliveries of teas, coffees and spices, or other goods, wares and merchandise carried by the party of the first part, either for himself or for any firm of which he may be a member or by it employed, or for any other individual or corporation, either directly or indirectly, to any of the customers" of Cahill with whom he might be brought in contact while soliciting and delivering orders for teas, coffees, etc., and while working for Cahill. We regard the undertaking of Cahill to employ Madison upon the terms and for the period above stated, a sufficient consideration for the agreement of Madison above recited. It is enough to support the contract, so far as concerns the consideration, that there was a good consideration in law. The adequacy of the consideration is a matter of agreement between the parties. Linn v. Sigsby, 67 Ill. 75; Hursen v. Gavin, 162 Ill. 377–80.

We can not say that the contract is at all unconscionable. No like case is cited by appellee's counsel holding that a similar contract has been held to be unconscionable. Taking all the provisions, terms and conditions of the contract into consideration, and the nature of appellee's employment, the time that he actually worked for appellant, and our common experience with reference to compensation paid to salesmen in ordinary commercial business, we think it can

not be said that the contract is in any way unfair, unreasonable, or oppressive to appellee; nor does it give to appellant any undue or unconscionable advantage over appellee. The employment is in its nature fiduciary and confidential, and it would seem to us a gross breach of confidence and fair dealing, even without any agreement, for appellee, after more than two years of service for appellant, receiving from him his regular wages and having acquired an intimate knowledge of the nature and character of appellant's business, to have quit appellant's employ and made a deliberate attempt to deprive appellant of the trade of the very customers to get whom he had been paid for his services by appellant. To prevent any such result appellant, as a part of the consideration of employment of appellee, might very properly and reasonably have required the very undertaking of appellee contained in this contract. Appellee is not prohibited by the agreement from earning his living in the line of his business, but only from attempting to take from appellant a few hundred customers whose trade the latter might naturally, reasonably and rightfully expect in the usual and ordinary course of his business. Appellee has free scope to procure business from all other persons in Chicago, its suburbs and surrounding country.

It is said that appellant should be deprived of the relief asked because he has made no offer to perform or do equity. We are at a loss to see what application this proposition has to the case at bar. Appellee, by leaving appellant's employ and doing the things set out in the bill, has directly violated his contract, and so far as any of its provisions require appellant to do anything, the contract is at an end. It only remains for appellee to refrain from a violation of the only remaining provision of the contract, viz., to refrain for the period of one year from the attempt to take appellant's customers.

Lastly it is claimed for appellee that this bill attempts to specifically enforce the contract in question, and that because appellee has no special skill and nothing uncommon in his qualifications, a court of equity will not attempt a specific enforcement of the contract.

It is true, as a general rule, that equity will not, by injunction, interfere to restrain a violation of a restrictive covenant in relation to personal services. Pomeroy's Equity Juris., Sec. 1343; Welty v. Jacobs, 171 Ill. 624-30; Strowbridge L. Co. v. Crane, 12 N. Y. Suppl. 898; Burney v. Ryle, 17 S. E. Rep. 986 (Ga.).

We are of opinion, however, that this rule is not applicable to the case at bar. This is not a question of enforcing a restrictive covenant relating to personal services of appellee, but of his betraying a trust and confidence reposed in him by his employer by attempting to take away, for his own benefit and in direct violation of his express contract, his employer's customers, knowledge of whom he had acquired in the course of the performance of his duty as an employe. This is what may be termed a contract in partial restraint of trade. It is said in the recent case of Lanzit v. Sefton Mfg. Co., 184 Ill. 326-9, that "contracts only in partial restraint of trade are valid and enforceable if reasonable and supported by a consideration good in law." The court was speaking with reference to a contract containing a negative covenant by the appellant, which prohibited him from engaging in a certain business of manufacturing within the States of Indiana and Illinois after he should leave the employment of the appellee, in which he had been engaged as a salesman, and held that the contract could not be enforced throughout the States of Illinois and Indiana, but expressly declined to hold that it might not be enforced in so far as it related to the county of Cook in Illinois.

The general doctrine announced in the Lanzit case is held in a number of cases therein cited, also by the cases of Fairman v. Bavin, 29 Ill. 75; Cobbs v. Niblo, 6 Ill. App. 60; Davis v. Hamlin, 108 Ill. 39-49; Darnell v. Geis, 78 Ill. App. 493-8; C. & W. T. Co. v. Tloczynski, 114 Mich. 149-60; Fralich v. Despar, 165 Pa. St. 24; Underwood v. Barker, 68 L. J. Ch. N. S. 201; Carter v. Alling, 43 Fed. Rep. 208-14; 1 Story Eq. Juris. (12th Ed.), Sec. 292; Mitchell v. Reynolds, 1 Smith's L. Cases (9th Ed.), 694-705-8, and cases cited in note.

In the Hursem case, 162 Ill. 377, cited with approval in the Lanzit case, *supra*, a similar covenant to the one here under consideration, relating to a livery and undertaking business for the period of five years in Chicago, was sustained and enforced by an injunction.

In the Darnell case, *supra*, a covenant not to sub-let a store for use in a particular business, was sustained.

In the Fairman case the court states that it was "disposed to go to the extremest length to hold agents, or those occupying fiduciary capacities, to the strictest fairness toward their principals, and to prevent them from taking advantage of their position to benefit themselves at the expense or disadvantage of their principals.", This was said with relation to the claim that a confidential clerk had, in violation of the confidence reposed in him as such clerk by his employer, obtained a lease to himself of the premises where the employer's business had been carried on.

In the recent case cited *supra*, from 114 Mich., where an employe of a manufacturer by his contract of employment agreed not to disclose any of the secrets of the employer's business and machinery, his contract was held binding and enforced by a writ of injunction. Numerous cases are cited and reviewed by the court in support of its ruling, and the court say :

"We can not see how it can be against public interest to allow an employer to make such conditions of employment with his employes as will give him the fullest protection to his property right in his process or invention, and at the same time enable him to employ a great many employes in its production. * * * It is to the advantage of both that such a contract should be allowed. By means of it defendant secured employment which he could not have secured without it, and at the same time his employers were secured against competition which might be ruinous."

In the Fralich case, *supra*, the Pennsylvania Supreme Court sustained a like agreement of an employe not to reveal the secrets of his master's trade, and enforced the contract by injunction.

In the case of Rannie v. Irvine, cited in the note to the Mitchell case, *supra*, where a lease and good will of a baker's

shop had been sold with a covenant against soliciting the custom of or knowingly supplying bread or flour to any of the customers, the covenant was enforced by an injunction. So in the case of Mumford v. Gething, cited in the same note, a commercial traveler was enjoined from traveling for any other firm than the plaintiff, within the district in which it employed him.

In the Carter case, *supra*, which was one of a contract by a traveling salesman of a manufacturing corporation, who had been in its employ for several years, not to enter the service of any of its business competitors for three years after leaving his employer, the contract was held reasonable, valid and enforceable, and the court, after a review of numerous cases, English and American, deduces the following rule, viz.:

"An employer has the right to bind an employe not to go into the employ of a competitor for a reasonable time after his employment terminates, within the territory where the employer seeks his market; and whether such covenant is reasonable and binding, is a judicial question, which must depend, in each case, upon its peculiar facts and circumstances."

In the Underwood case, *supra*, decided in 1899, by the English Court of Appeals, Chancery Division, an employe, as clerk and foreman at a weekly wage, of a hay and straw merchant, whose business extended throughout the United Kingdom of Great Britain, France, Belgium, Holland and Canada, was held bound by his agreement not to engage in said business within said territory for the period of twelve months next after leaving his employer. The case seems to have been very carefully considered, separate opinions being delivered by the master of the rolls and the justices, one of them dissenting. The master of the rolls, among other things, says:

"The modern doctrine, as I understand it, is that if an agreement restraining a person from carrying on business is injurious to the public interests of this country, such agreement is invalid to the extent to which it is injurious, but not further. * * * But where an agreement restraining a person from carrying on business is entered into

with another person engaged in a similar business, for the purpose of protecting him from rivalry in that business, and is no wider than reasonably necessary for his protection in that business, it is difficult to imagine the circumstances which can render such agreement injurious to the public interests of this country."

It is, however, unnecessary in this case, in order to sustain the agreement here, to go to the extent of either of the last two preceding cases.

It would seem, upon a full consideration of all the cases, that no absolute and more definite rule can be laid down which may be applied to every case arising, than the one quoted from the Lanzit case, *supra*.    Each case must depend upon its own peculiar facts and circumstances.

We think it apparent, from a consideration of the allegations of this bill, which, for the purposes of this case, must be considered as true, and the contract, that the provision here in question is valid and should be enforced; that the restraint of appellee is but partial, is a reasonable one, has a good consideration to support it, is but a fair protection to the interests of appellant, and can not in any serious way interfere with the interest of the public.    It follows that the learned chancellor was in error in sustaining the demurrer and dismissing appellant's bill for want of equity.

The time for which the injunction ran, by the original order, having expired, the practical result sought by appellant is probably attained; but inasmuch as appellee has the right to contest the matters of fact alleged in the bill, the decree is reversed and the cause remanded for further proceedings consistent with this opinion.    Reversed and remanded.